# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| CompuCredit Holdings Corporation, | **Case No.:** |
| Plaintiff, | |
| vs. | |
| Akanthos Capital Management, LLC; Aria Opportunity Fund Ltd.; AQR Absolute Return Master Account, L.P.; CC Arbitrage, Ltd.; CNH CA Master Account, L.P.; Galileo Partners Fund I, L.P.; GLG Investments plc: sub-fund GLG Global Convertible UCITS Fund; GLG Investments IV plc: sub-fund GLG Global Convertible UCITS (Distributing) Fund; GLG Global Convertible Fund plc; GLG Market Neutral Fund; Highbridge International LLC; Kamunting Street Master Fund, Ltd.; KBC Financial Products (Cayman Islands) Ltd.; Kingstown Partners, L.P.; Pandora Select Advisors, LLC; Parsoon Opportunity Fund Ltd.; Tenor Opportunity Master Fund, Ltd.; Whitebox Advisors, LLC; Whitebox Combined Advisors, LLC; Whitebox Convertible Arbitrage Advisors, LLC; and Whitebox Hedged High Yield Advisors, LLC, | **COMPLAINT** |
| Defendants. | |

COMES NOW, Plaintiff CompuCredit Holdings Corporation ("CompuCredit"), as and for its Complaint against Defendants Akanthos Capital Management, LLC ("Akanthos"), Aria Opportunity Fund Ltd. ("Aria"), AQR Absolute Return Master Account, L.P. ("AQR"), CC Arbitrage, Ltd. ("CC"), CNH CA Master Account, L.P. ("CNH"), Galileo Partners Fund I, L.P. ("Galileo"), GLG Investments plc: sub-fund GLG Global Convertible UCITS Fund ("GLG Investments"), GLG Investments IV plc: sub-fund GLG Global Convertible UCITS (Distributing) Fund ("GLG IV"), GLG Global Convertible Fund plc ("GLG Global"), GLG Market Neutral Fund ("GLG Market Neutral"), Highbridge International LLC ("Highbridge"), Kamunting Street Master Fund, Ltd. ("Kamunting"), KBC Financial Products (Cayman Islands) Ltd. ("KBC"), Kingstown Partners, L.P. ("Kingstown"), Pandora Select Advisors, LLC ("Pandora"), Parsoon Opportunity Fund Ltd. ("Parsoon"), Tenor Opportunity Master Fund, Ltd. ("Tenor"), Whitebox Advisors, LLC ("Whitebox Advisors"), Whitebox Combined Advisors, LLC ("Whitebox Combined"), Whitebox Convertible Arbitrage Advisors, LLC ("Whitebox Convertible"), and Whitebox Hedged High Yield Advisors, LLC ("Whitebox Hedged"), (collectively, "Defendants"), states and alleges as follows:

## INTRODUCTION

1.      Beginning not later than December 2009, Defendants conspired to fix Plaintiff CompuCredit's convertible senior note prices and to coerce CompuCredit to pay inflated, above-market prices for those notes.  Defendants' acts in furtherance of this conspiracy include, but are not limited to, the following:  (a) jointly demanding that CompuCredit pay the full, face value (or "par") of CompuCredit's convertible senior

notes in Defendants' possession—almost twice their current market price; (b) in contravention of each Defendant's economic self-interest, providing false letters and other communications to third parties contending that CompuCredit is insolvent and that it violated certain indentures; (c) as acknowledged by David Kay on behalf of Defendants, agreeing to purchase CompuCredit's convertible senior notes *after* making these insolvency and other allegations in order to inflate the prices of those notes; (d) conspiring to boycott CompuCredit's January 28, 2010 offer to repurchase its convertible senior notes; and (e) filing a sham lawsuit contending that CompuCredit is insolvent when they know it to be untrue.

2.      As requested relief herein, CompuCredit prays that this Court enjoin Defendants' conspiracy and order Defendants to tender their CompuCredit convertible senior notes to CompuCredit at the highest price that CompuCredit paid pursuant to its January 28, 2010 offer to repurchase its Notes.  Alternatively, CompuCredit prays that this Court enjoin Defendants from concertedly attempting to affect the price of CompuCredit's convertible senior notes and to prohibit Defendants from communicating with each other regarding CompuCredit's convertible senior notes, and from communicating with each other and third parties regarding CompuCredit's alleged insolvency and/or CompuCredit's alleged breach of any Indenture.

## PARTIES

3.      CompuCredit is a Georgia corporation with its principal place of business in Atlanta, Georgia.  CompuCredit is a provider of various credit and related financial services and products.

- 2 -

4.     Defendants were all parties to the suit *Akanthos Capital Management, LLC, et al. v. CompuCredit Holdings Corp.*, No. 09-cv-3664 (D. Minn. Dec. 21, 2009), which ostensibly related to CompuCredit's issuance of a dividend and its announcement of a possible spin-off of a micro-loan business.  This suit was transferred to the U.S. District Court for the Northern District of Georgia by Order dated March 19, 2010 by the Honorable James M. Rosenbaum.

5.     Defendant Akanthos is a Delaware limited liability company.  According to Akanthos, it holds a portion of the convertible senior notes issued by CompuCredit.  Akanthos is a Securities and Exchange Commission ("SEC")-registered investment advisor.

6.     Defendants Aria, Parsoon, and Tenor are Cayman Island companies.  According to Aria, Parsoon, and Tenor, they hold a portion of the convertible senior notes issued by CompuCredit.  Aria, Parsoon, and Tenor are not registered with the SEC, and are accordingly not within the purview of the SEC.

7.     Defendants AQR and CNH are Cayman Islands master limited partnerships.  According to AQR and CNH, they hold a portion of the convertible senior notes issued by CompuCredit.  AQR and CNH are not registered with the SEC, and are accordingly not within the purview of the SEC.

8.     Defendant CC is a Cayman Island company.  According to CC, it holds a portion of the convertible senior notes issued by CompuCredit.  CC is not registered with the SEC, and is accordingly not within the purview of the SEC.

9.      Defendant Galileo is a Delaware limited partnership.  According to Galileo, it holds a portion of the convertible senior notes issued by CompuCredit.  Galileo is not registered with the SEC, and is accordingly not within the purview of the SEC.

10.      Defendants GLG Investments, GLG IV, and GLG Global are public limited companies incorporated in, with their principal place of business in, Ireland.  Defendant GLG Market Neutral is a limited liability company incorporated in, and with its principal place of business in, the Cayman Islands.  According to GLG Investments, GLG IV, GLG Global, and GLG Market Neutral, they hold a portion of the convertible senior notes issued by CompuCredit.  GLG Investments, GLG IV, GLG Global, and GLG Market Neutral are not registered with the SEC, and are accordingly not within the purview of the SEC.

11.      Defendant Highbridge is a Cayman Island company.  According to Highbridge, it holds a portion of the convertible senior notes issued by CompuCredit. Highbridge is not registered with the SEC, and is accordingly not within the purview of the SEC.

12.      Defendant Kamunting is a Cayman Island company.  According to Kamunting, it holds a portion of the convertible senior notes issued by CompuCredit. Kamunting is not registered with the SEC, and is accordingly not within the purview of the SEC.

13.      Defendant KBC is a Cayman Island company.  According to KBC, it holds a portion of the convertible senior notes issued by CompuCredit.  KBC is not registered with the SEC, and is accordingly not within the purview of the SEC.

14.     Defendant Kingstown is a Delaware limited partnership.  According to Kingstown, it holds a portion of the convertible senior notes issued by CompuCredit. Kingstown is not registered with the SEC, and is accordingly not within the purview of the SEC.

15.     Defendants Pandora, Whitebox Advisors, Whitebox Combined, Whitebox Convertible, and Whitebox Hedged are each Delaware limited liability companies and residents of Minnesota.   According to Pandora, Whitebox Advisors, Whitebox Combined, Whitebox Convertible, and Whitebox Hedged, they hold a portion of the convertible senior notes issued by CompuCredit.  Whitebox Advisors is a SEC-registered investment advisor.   Pandora, Whitebox Combined, Whitebox Convertible, and Whitebox Hedged are not registered with the SEC, and are accordingly not within the purview of the SEC.

16.     As stated above, two of the Defendants are SEC-registered investment advisors.  None of the Defendants is a SEC-registered reporting company.

17.     Defendants compete against one another with respect to the purchase and sale of CompuCredit's convertible senior notes.

## JURISDICTION AND VENUE

18.     This Court possesses jurisdiction over this matter pursuant to 15 U.S.C. §§ 1 & 26 and 28 U.S.C. §§ 1331, 2201 & 2202.

19.     Among other things, Defendants' conspiracy, as well as their buying and selling of CompuCredit's convertible senior notes, has affected, and currently affects, a not insubstantial amount of interstate commerce.

- 5 -

20.     Venue is appropriately laid in this judicial district pursuant to 28 U.S.C. § 1391(b).  A substantial part of the events giving rise to this case arose in the District of Minnesota.  The *Akanthos* Lawsuit was filed by Defendants in the District of Minnesota, and three hearings were held in Minnesota.   The law firm that was the agent of Defendants and acted at their direction at all times pertinent to this action has its principal place of business in the District of Minnesota and sent the purported "settlement" offer from Defendants to CompuCredit from the District of Minnesota.

## FACTS

21.     Beginning not later than sometime in December 2009, Defendants agreed to coerce CompuCredit to repurchase its convertible senior notes from each Defendant at inflated, above-market prices.

## I.     COMPUCREDIT'S CONVERTIBLE SENIOR NOTES AND THE INDENTURES

22.     Defendants claim to own approximately 70% of CompuCredit's outstanding convertible senior notes (collectively, the "Notes"), which were issued by CompuCredit in two series: (a) 3.625% convertible notes due in the year 2025 pursuant to and governed by an Indenture dated May 27, 2005 (the "2025 Notes"); and (b) 5.875% convertible senior notes due in the year 2035 pursuant to and governed by an Indenture dated November 23, 2005 (the "2035 Notes").   The holders of the 2025 Notes may require the Company to repurchase some or all of their notes in 2012.   The 2035 Notes have no similar provision.   The Notes were originally issued pursuant to private placements.

23.     Each Indenture sets forth the rights of the Noteholders.  As is customary with convertible notes, the Noteholders negotiated for the right to convert their Notes into common stock in lieu of the financial covenants that might restrict or require noteholder approval of certain transactions.  Consequently, there are no covenants prohibiting the payment of dividends or spin-off transactions.  In fact, the Indentures expressly contemplate a variety of corporate transactions and provide for adjustments to the conversion rate when they occur.

## II.    COMPUCREDIT'S DIVIDEND AND DEFENDANTS' ORIGINAL DEMAND

24.     In a December 3, 2009 press release, CompuCredit announced "a dividend of $.50 per share payable to holders of record as of the close of trading on December 31, 2009," totaling approximately $25 million.  In the same press release, CompuCredit also announced that it was "*considering* a tax-free spin-off of its U.S. and U.K. micro-loan businesses into a publicly-traded company."  (Emphasis added).  This press release made clear that the proposed spin-off had not yet been approved by CompuCredit's Board of Directors.  In accordance with the Indentures, written notice of the dividend was provided to the Indenture Trustee, U.S. Bank National Association.

25.     In a December 8, 2009 letter, Defendants complained to CompuCredit about the dividend and the contemplated spin-off.  Among other things, Defendants demanded that CompuCredit retract its then-planned dividend.

26.     However, as later events have now made clear, Defendants followed this strategy as part and parcel of a conspiracy to coerce CompuCredit to buy Defendants' Notes at inflated, above-market prices.

## III.     THE *AKANTHOS* LAWSUIT

### A.     CompuCredit's Solvency

27.     In CompuCredit's Form 10-Q for the quarterly period ended September 30, 2009 (filed November 9, 2009), CompuCredit reported equity in excess of $254 million and over $119 million in cash.

28.     In CompuCredit's Form 10-K relating to the year 2009 (filed March 5, 2010), CompuCredit reported equity in excess of $207 million and over $190 million in cash.

29.     CompuCredit has never missed a single interest payment with respect to the 2025 Notes or the 2035 Notes.

30.     CompuCredit has paid, and is paying, its debts as they come due.

### B.     Defendants' First Complaint

31.     Defendants filed the *Akanthos* Lawsuit on December 21, 2009 along with a Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery.  Defendants sought to enjoin the dividend, as well as the contemplated, but not yet approved, spin-off.  Defendants falsely alleged that both the distribution and the spin-off were fraudulent transfers because, among other things, CompuCredit was allegedly "insolvent."

32.     Defendants' First Complaint contained two counts:  (a) a claim under the Uniform Fraudulent Transfers Act ("UFTA"); and (b) a claim under the Georgia corporate code.

33.     In Defendants' First Complaint, Defendants did not seek damages in any form.

34.     In Defendants' First Complaint, Defendants did not ask the Court to compel CompuCredit to repurchase Defendants' Notes at any price.

35.     The Defendants' decision not to ask the Court to compel CompuCredit to repurchase Defendants' Notes illustrates that the Defendants filed the *Akanthos* Lawsuit for the improper purpose of coercing CompuCredit to repurchase Defendants' Notes, rather than for the legitimate purpose of seeking judicial relief.

### C.      The December 29, 2009 TRO Hearing

36.     On December 29, 2009, after a hearing on the merits of Defendants' motion for a temporary restraining order, this Court denied Defendants' request to enjoin CompuCredit's distribution to shareholders as well as Defendants' request for expedited discovery.  Accordingly, CompuCredit made the dividend payment to shareholders on December 31, 2009.

37.     As part of his Order denying the Defendants' requested preliminary injunctive relief, the Honorable James M. Rosenbaum for the United States District Court of Minnesota specifically found that CompuCredit was not insolvent:

> But third, and in its way, the most profoundly troubling to the Court, is the claim that the corporation is insolvent.  *It is not insolvent.*  The plaintiffs advance the affidavit of an accountant who is an accounting expert, a CPA,

who says it is insolvent on a pro-forma basis. A pro forma is a set of assumptions that are made about events in the view of the person who advances it. And if you add and subtract the numbers Mr. McDonough thinks need to be added and subtracted, you could extract, I guess, the fact that the corporation is insolvent. On the other hand, there's no indication whatsoever that there is an accepted methodology for applying to a regular and ongoing corporation his set of pro-forma assumptions in a fashion which shows that this court ought to step in, into what is otherwise a functioning marketplace, and substitute its judgment for that of the Board of Directors. . . . But at this point there is precious little, other than his own ad hominem belief in the validity of his own opinions, that this company is somehow insolvent.

Transcript of Proceedings, Dec. 29, 2009 at 62-63 (emphasis added).

### D.    CompuCredit's Possible Spin-Off

38.    On January 4, 2010, a Form 10 was filed with the SEC regarding Purpose Financial Holdings, Inc. ("Purpose Financial"). Purpose Financial is CompuCredit's micro-loan business that could be subject to the possible "spin-off" transaction. If the spin-off occurs, CompuCredit shareholders will receive shares in Purpose Financial. The SEC approval process is a necessary, preliminary step that must be completed before CompuCredit's Board of Directors can consider approving the spin-off.

### E.    Defendants' Amended Complaint

39.    On January 26, 2010, CompuCredit filed a Motion to Dismiss the First Complaint. After this motion was filed, Defendants voluntarily dismissed Count II of their First Complaint, *i.e.*, the count relating to the alleged violation of the Georgia corporate code.

40.     On February 22, 2010, Defendants filed their Amended Complaint.  In their Amended Complaint, Defendants asserted a single cause of action claiming that the dividend and the possible spin-off violated the UFTA.

41.     The focus of the Amended Complaint is the possible spin-off of Purpose Financial.   However, recognizing that the original claim to enjoin the payment to shareholders was now moot, Defendants inserted a naked and unsupported claim for damages related to the dividend.  Specifically, Defendants seek $25 million, *i.e.*, the same amount as the December 31, 2009 dividend, as damages.

42.     In Defendants' Amended Complaint, Defendants have not asked the Court to compel CompuCredit to repurchase Defendants' Notes at any price.

43.     Defendants' Amended Complaint is equally baseless as their First Complaint.  Defendants do not believe—nor would any reasonable litigant believe—that CompuCredit's publicly-announced and contemplated spin-off constitutes a fraudulent transfer, because, among other things, Defendants know that CompuCredit is not insolvent.

44.     The damages claim included in Defendants' Amended Complaint is baseless.  Neither Minnesota nor Georgia's UFTA permits a damages claim against the transferor/debtor, *i.e.*, CompuCredit.  Moreover, Defendants know—as any reasonable litigant would know—that they have not suffered any monetary losses as a result of the conduct that they challenge because, as noted above and as Judge Rosenbaum found, CompuCredit is not insolvent.

## IV. DEFENDANTS' CONSPIRACY TO BOYCOTT COMPUCREDIT'S JANUARY 2010 OFFER TO REPURCHASE ITS NOTES

### A. Defendants Suggest That CompuCredit Use Its Cash To Repurchase CompuCredit's Notes At Discounted Prices.

45.     At the December 29, 2009 hearing relating to Defendants' motion for a temporary restraining order, Defendants' counsel argued that CompuCredit should not use its cash to declare a dividend, but should instead use its cash to repurchase its bonds at discounted prices.

46.     For example, at the December 29, 2009 hearing, Defendants' counsel stated:

> a.     "[A] good strategy would be to take any cash and buy back their debt, buy back these notes at deeply discounted prices."  Transcript of Proceedings, Dec. 29, 2009 at 17.

> b.     "They could get huge reductions—50, 60 percent."  *Id.* at 26.

### B. CompuCredit's January 2010 Offer To Repurchase Its Notes

47.     On January 22, 2010, Defendants' counsel filed a sworn declaration stating that ". . . counsel for the [CompuCredit] informed me that Compucredit [sic] was interested in purchasing holders' notes and that holders should speak directly with company management on that topic.  Later that day and subsequently I was contacted by several note holders [sic], both clients and non clients, who informed me that the Company offered to buy their notes at current market prices."

48.     On January 28, 2010, CompuCredit made an offer to repurchase up to $160.0 million aggregate principal amount of the outstanding Notes.  The prices that

CompuCredit offered to pay in this offer were either equal to, or slightly above, then-existing market prices.

49.     Pursuant to the January 28, 2010 offer, CompuCredit recently repurchased $40.3 million in aggregate face amount of the 2025 and 2035 Notes (approximately 11% and 10% of the outstanding principal amount of the Notes, respectively) for an aggregate total cost of $17.8 million.   CompuCredit repurchased the 2025 Notes for $500 per $1,000 principal amount of such Notes, for a total cost of $12,358,500.   The 2035 Notes were repurchased at a price of $350 per $1,000 principal amount of such Notes, for a total cost of $5,443,900.   Excluding accrued interest and fees and other expenses in connection with the January 28, 2010 offer, the Notes were repurchased for an aggregate total cost of $17,802,400.   Upon information and belief, those that accepted CompuCredit's January 28, 2010 offer are sophisticated parties with knowledge of the fair value of CompuCredit's Notes.

50.     None of the Defendants tendered their Notes to CompuCredit pursuant to CompuCredit's January 28, 2010 offer.

51.     On information and belief, Defendants agreed among themselves to refrain from tendering their Notes to CompuCredit pursuant to CompuCredit's January 28, 2010 offer.

**C.     Defendants' Boycott Of The January 28, 2010 Offer And Collusive Demand On CompuCredit Harmed Competition.**

52.     There exists a relevant market, the product dimension of which is CompuCredit Notes, and the geographic dimension of which is the United States.

- 13 -

53.     CompuCredit's Notes are unique.    Among other things, they could be converted into CompuCredit's common stock.    And from CompuCredit's perspective, there is no reasonable substitute for CompuCredit's Notes because the repurchase or redemption of its own Notes is the only means by which CompuCredit can extinguish this debt prior to maturity.

54.     CompuCredit cannot repurchase its Notes from any source other than CompuCredit Noteholders.

55.     Defendants have market power in the market for CompuCredit Notes as they claim to hold approximately 70% of the Notes.

56.     Defendants' boycott of the January 28, 2010 offer and their collusive demand that CompuCredit repurchase their Notes at par harms competition by inflating the price at which CompuCredit and others can purchase CompuCredit's Notes.

## V.     DEFENDANTS MADE FALSE STATEMENTS AS PART OF THEIR CONSPIRACY TO COERCE COMPUCREDIT TO REPURCHASE DEFENDANTS' NOTES AT INFLATED, ABOVE-MARKET PRICES.

57.     After failing in federal court, Defendants began seeking non-judicial routes to coerce CompuCredit to repurchase Defendants' Notes at inflated, above-market prices. Specifically, as part of their conspiracy, Defendants proceeded to make and publish several false, out-of-court statements regarding CompuCredit's alleged insolvency and breaches of the Indentures.

58.     By advancing the below-described communications, Defendants acted against the unilateral and individual economic interests to promote their price-fixing and bid-rigging conspiracy.    Indeed, unless a conspiracy exists, Defendants have no incentive

to make communications that CompuCredit is insolvent or breached the Indentures. Indeed, such communications would logically *decrease* CompuCredit bond prices, and thus harm Defendants' economic self-interests.   But for the same reasons that Defendants' statements are against their own economic self-interests, Defendants know that their communications will harm CompuCredit and therefore pressure it to bring the *Akanthos* Lawsuit to an end by any means possible, including purchasing Defendants' Notes at inflated prices.   Thus, by advancing the below-described communications, Defendants acted against their unilateral and individual economic interests to promote their price-fixing and bid-rigging conspiracy.

59.     Defendants' below-described communications are acts in furtherance of their conspiracy to coerce CompuCredit to pay inflated, above-market prices for its convertible senior notes.   These joint communications further demonstrated the concerted nature of Defendants' actions and the existence of an agreement, combination, and conspiracy in restraint to trade.

### A.     The January 27, 2010 BDO Letter

60.     Almost one month after the U.S. District Court for the District of Minnesota specifically found that CompuCredit was solvent, on January 27, 2010, Defendants' counsel sent a letter to CompuCredit's auditor, BDO Seidman, LLP ("BDO Letter").

61.     The BDO Letter attached a copy of Defendants' alleged expert report from Edward M. McDonough ("McDonough Report").   By sending McDonough's report to BDO, among other ways, Defendants adopted the statements contained therein as true.

62.     The BDO Letter quoted Mr. McDonough and falsely concluded that the "ability of [CompuCredit] to continue as a going concern" was "uncertain."

63.     Moreover, the BDO Letter falsely stated that "CompuCredit's ability to continue as a going concern is not merely uncertain but is subject to 'substantial doubt.'" (Citing SAS 59).

64.     Defendants' communications to BDO Seidman would logically *decrease* the prices of CompuCredit's convertible senior notes.  By making said communications, therefore, Defendants acted against their unilateral and individual economic self-interests.  Absent the conspiracy alleged herein, Defendants would not have made these communications to BDO Seidman.

**B.     The February 5, 2010 SEC Letter**

65.     By letter dated February 5, 2010, Defendants wrote the Securities and Exchange Commission ("SEC Letter") and made similar false statements as in the BDO Letter.

66.     In the SEC Letter, Defendants falsely stated "[CompuCredit] is already insolvent."

67.     The SEC Letter was sent approximately 38 days after the U.S. District Court for the District of Minnesota specifically found that CompuCredit was solvent.

68.     The Defendants did not inform the SEC of this finding by the U.S. District Court for the District of Minnesota.

69.     Defendants' communications to the SEC would logically *decrease* the prices of CompuCredit's convertible senior notes.  By making said communications,

therefore, Defendants acted against their unilateral and individual economic self-interests. Absent the conspiracy alleged herein, Defendants would not have made these communications to the SEC.

### C.     Defendants' Communications To U.S. Bank

70.     As stated above, U.S. Bank National Association ("U.S. Bank") is the indenture trustee for the Notes purchased by Defendants.

#### 1.     In court, Defendants contended that CompuCredit did not breach the Indentures and that the Indentures were "irrelevant."

71.     In court, Defendants contended that CompuCredit had not breached the Indentures and that the Indentures were irrelevant to the *Akanthos* Lawsuit.

72.     For example, at the December 29, 2009 hearing before Judge Rosenbaum, Defendants' counsel stated that "this is not an indenture case" and that "we're not here saying that that contract [*i.e.*, the Indenture] has been breached at this point in time." Transcript of Proceedings, Dec. 29, 2009 at 4, 18.

73.     In addition, on March 19, 2010, Defendants' counsel stated that "[t]he Indenture is absolutely irrelevant to this case and to the issues which are before your Honor." Transcript of Proceedings, Mar. 19, 2010 at 21-22.

#### 2.     Out of court, Defendants contended that CompuCredit breached the Indentures.

74.     According to U.S. Bank, Defendants communicated at least two times with U.S. Bank in late 2009/early 2010.

75.     These communications with U.S. Bank included false statements regarding CompuCredit's alleged breaches of the Indentures.  Specifically, and according to a March 15, 2010 letter sent by U.S. Bank to CompuCredit ("U.S. Bank Letter"), Defendants falsely communicated to U.S. Bank that CompuCredit "is violating the Indentures and intends to do so in the future."

76.     U.S. Bank noted that these communications were made in the form of "very vocal allegations by Noteholders."

77.     Defendants' communications to U.S. Bank would logically *decrease* the prices of CompuCredit's convertible senior notes.  By making said communications, therefore, Defendants acted against their unilateral and individual economic self-interests. Absent the conspiracy alleged herein, Defendants would not have made these communications to U.S. Bank.

## VI.   DEFENDANTS DEMAND THAT COMPUCREDIT REPURCHASE DEFENDANTS' NOTES AT PAR.

78.     On March 9, 2010, CompuCredit and Defendants participated in a discovery conference in the *Akanthos* Lawsuit.

79.     On March 8, 2010, Defendants' counsel made the following demand on CompuCredit:

> In anticipation of tomorrow's pretrial conference, plaintiffs hereby demand par with respect to their entire holdings of each of the two series of CompuCredit notes, together with all accrued and unpaid interest as of the date of tender.
>
> We look forward to your response.

80.     In early March 2010, CompuCredit's 2025 Notes traded at approximately 53.5% of par.

81.     In early March 2010, CompuCredit's 2035 Notes traded at approximately 37% of par.

82.     Again, Defendants never sought relief to compel CompuCredit to repurchase Defendants' Notes at any price in their First Complaint or Amended Complaint in the *Akanthos* Lawsuit, let alone at par.

83.     No law permitted, or permits, Defendants to seek relief to compel CompuCredit to repurchase Defendants' Notes at any price.  Indeed, if such law existed, Defendants would have alleged it in the *Akanthos* Lawsuit.  Defendants' March 8, 2010 demand, therefore, has no reasonable relation to the *Akanthos* Lawsuit.

84.     Defendants' agreement to refuse to sell the Notes at anything other than inflated prices continues to this day.

## VII.    DEFENDANTS' CONTINUED PURCHASES OF COMPUCREDIT'S NOTES

85.     If Defendants truly believed—as they have contended in and out of court—that CompuCredit was insolvent, they would not continue to purchase CompuCredit's Notes.

86.     On or about March 24, 2010, David Kay, on behalf of Defendant Tenor, telephoned CompuCredit's Treasurer, William R. McCamey.

87.     During this March 24 telephone call, Kay told CompuCredit's Treasurer, among other things, the following:

a.   the "group," *i.e.*, Defendants, had recently purchased CompuCredit's Notes;

b.   Defendants *increased* their purchases of CompuCredit's Notes after the December 29, 2009 hearing regarding Defendants' motion for a temporary restraining order.   Specifically, Kay stated that Defendants increased their stake in CompuCredit's 2025 Notes and as a result of this increased stake, they owned more than $140,000,000 of CompuCredit's 2025 Notes;

c.   When a company, such as CompuCredit, engages in a offer to repurchase notes, it is traditional to first establish the price of the offer with the largest noteholders prior to the tender;

d.   Defendants agreed as a group not to participate in CompuCredit's January 28, 2010 offer because the offered price, according to Defendants, was too low; and

e.   Defendants would sell their notes to CompuCredit between 65-70% of par, which was a premium to the recent market trades and Defendants thought that that was an appropriate reference price.

88.   On March 26, 2010, Kay spoke to CompuCredit's Treasurer again.  During this call, Kay repeated the statements described in the immediately-preceding paragraph.

89.   Pursuant to Defendants' coordinated efforts, another Defendant represented to CompuCredit that it possessed a document containing the amount of notes held by all

Defendants and that Defendants now collectively owned over $150,000,000 of CompuCredit's 2025 Notes.

90.    There is no legitimate, pro-competitive reason for Defendants to possess information regarding the quantity of CompuCredit's Notes owned by other Defendants.

91.    Currently, CompuCredit has approximately $206,000,000 of 2025 Notes outstanding.   Therefore, according to certain of the Defendants, Defendants now own approximately 73% of CompuCredit's 2025 Notes, and approximately 70% of CompuCredit's 2025 Notes and 2035 Notes combined.

## VIII.   DEFENDANTS KNOW THE *AKANTHOS* LAWSUIT IS A SHAM.

92.    The *Akanthos* Lawsuit was filed, and is maintained, as a part of Defendants' conspiracy to coerce CompuCredit to pay inflated, above-market prices for Defendants' Notes.

93.    Defendants' March 8, 2010 demand demonstrates that Defendants knew, and know, that the *Akanthos* Lawsuit was, and is, a sham, objectively baseless, and filed for the improper purpose of obtaining supracompetitive prices for their Notes, because, among other things: (a) Defendants could not, and did not, seek relief to compel CompuCredit to repurchase Defendants' Notes at any price; (b) Defendants thereafter demanded that CompuCredit repurchase their Notes at full price; (c) Defendants know that CompuCredit has never missed a payment with respect to its convertible senior notes; (d) Defendants know that CompuCredit has over $207 million in equity as of December 31, 2009; and (e) if Defendants truly believed that CompuCredit was or is

becoming insolvent (as they represented in and out of court), they would not have continued to purchase CompuCredit's bonds.

94.     In light of the facts that Defendants knew when they filed their two *Akanthos* complaints, no reasonable litigant could believe that the *Akanthos* Lawsuit would succeed.

95.     The Defendants are not pursuing the *Akanthos* Lawsuit based upon an actual desire to secure judicial relief; rather, they are using it as a means of coercing CompuCredit to pay inflated, above-market prices for the Notes.

## COUNT I
### Violation of the Sherman Act, 15 U.S.C. § 1

96.     CompuCredit incorporates by reference all preceding paragraphs as if fully set forth herein.

97.     Defendants entered into contracts, combinations, or conspiracies in restraint of trade, which continue to this day, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

98.     The unlawful contracts, combinations, and conspiracies consist of agreements among the Defendants to inflate CompuCredit's bond prices, to boycott CompuCredit's January 28, 2010 tender offer and future tender offers, and instead jointly demand that CompuCredit repurchase Defendants' Notes at par.

99.     Each of the Defendants had actual knowledge of, and knowingly participated in, the contracts, combinations, and conspiracies described herein.

100.    The unlawful contracts, combinations, and conspiracies alleged herein unreasonably restrain trade in the market for CompuCredit Notes, in that they have the effect of inflating the price at which CompuCredit can extinguish its debt by purchasing these Notes.

101.    The unlawful contracts, combinations, and conspiracies alleged herein have harmed, and continue to harm, CompuCredit in its business or property.

102.    The unlawful contracts, combinations, and conspiracies described herein are likely to continue unless enjoined.

103.    CompuCredit has been injured, and is currently threatened with injury, by reason of the anticompetitive agreement and actions taken by the Defendants in violation of Section 1 of the Sherman Act.

104.    CompuCredit's Notes are unique to CompuCredit.   CompuCredit cannot purchase reasonably-substitutable notes from any other person.

105.    Moreover, and due to, among other things, the part of Defendants' conspiracy that requires them to publish false statements regarding CompuCredit, monetary damages are inadequate to remedy the harm that Plaintiff CompuCredit has suffered and continues to suffer as a result of the contracts, combinations, and conspiracies described herein.

106.    Defendants' agreement includes an agreement not to sell the Notes at market prices and only to sell the Notes at inflated, above-market prices resulting from their conspiracy and, accordingly, is illegal *per se*.

107.   Plaintiff CompuCredit therefore requests that this Court issue an order, pursuant to 28 U.S.C. § 2201(a) and Fed. R. Civ. P. 57, that the contracts, combinations, and conspiracies described herein violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

## COUNT II
### Violation of the Sherman Act, 15 U.S.C. § 1

108.   CompuCredit incorporates by reference the following paragraphs as if fully set forth herein:  1 (except (e)), 2-3, 5-30, 36-38, 48-64, 70, 74-81, and 84-91.  In the alternative to Count I, CompuCredit does not incorporate any allegation that the *Akanthos* Lawsuit is a sham in this Count II.

109.   Defendants entered into contracts, combinations, or conspiracies in restraint of trade, which continue to this day, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

110.   As described in the March 2010 and other communications alleged herein, Defendants agreed and conspired to artificially inflate the price of CompuCredit's bonds.

111.   Defendants' agreement is not only shown via their admissions in the March 2010 and other communications alleged herein, but it is also demonstrated by, among other things:

    a.   Defendants' actions against their individual economic interests, including, without limitation, the BDO Letter and Defendants' communications with U.S. Bank;

    b.   Defendants' continued purchasing of CompuCredit's Notes after alleging that CompuCredit is, or was to become, insolvent; and

   c. Defendants' boycott of the January 28, 2010 CompuCredit tender offer and future tender offers.

112. Each of the Defendants had actual knowledge of, and knowingly participated in, the conspiracy described herein.

113. The unlawful contracts, combinations, and conspiracies alleged herein unreasonably restrain trade in the market for CompuCredit Notes, in that they have the effect of inflating the price at which CompuCredit can pay down its debt by purchasing its Notes.

114. The unlawful contracts, combinations, and conspiracies alleged herein have harmed, and continue to harm, CompuCredit in its business or property.

115. The unlawful contracts, combinations, and conspiracies described herein are likely to continue unless enjoined.

116. CompuCredit's Notes are unique to CompuCredit.  CompuCredit cannot purchase reasonably-substitutable notes from any other person.

117. Moreover, and due to, among other things, the part of Defendants' conspiracy that requires them to publish false statements regarding CompuCredit, monetary damages are inadequate to remedy the harm that Plaintiff CompuCredit has suffered and continues to suffer as a result of the contracts, combinations, and conspiracies described herein.

118. Defendants' agreement includes an agreement not to sell the Notes at market prices and only to sell the Notes at inflated, above-market prices resulting from their conspiracy and, accordingly, is illegal *per se*.

119.    Plaintiff CompuCredit therefore requests that this Court issue an order, pursuant to 28 U.S.C. § 2201(a) and Fed. R. Civ. P. 57, that the contracts, combinations, and conspiracies described herein violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

## PRAYER FOR RELIEF

**WHEREFORE,** CompuCredit respectfully requests that this Court:

1.    Enter a judgment declaring that Defendants violated 15 U.S.C. § 1;

2.    Order each Defendant to tender any and all of CompuCredit's 2025 Notes and 2035 Notes in its possession, custody, or control to CompuCredit at the highest prices that CompuCredit paid pursuant to its January 28, 2010 tender, namely, 50% of par for the 2025 Notes and 35% of par for the 2035 Notes;

3.    OR, IN THE ALTERNATIVE to #2:  For a period of two years from the date of the judgment, enjoin each Defendant from:

      a.    Engaging in any form of joint activity or coordinated action concerning the price of any CompuCredit convertible senior note; and

      b.    Communicating with each other regarding CompuCredit's convertible senior notes, and from communicating with each other and third parties regarding CompuCredit's alleged insolvency and/or CompuCredit's alleged breach of any Indenture;

4.      Award CompuCredit its costs, disbursements, and attorneys' fees as authorized by law;[1] and

5.      Grant CompuCredit such other and further relief as is just and equitable.


Dated:  April 8, 2010                    ROBINS, KAPLAN, MILLER & CIRESI
                                         L.L.P.


                                         By:     s/Christopher W. Madel
                                                 Christopher W. Madel, 230297

                                         K. Craig Wildfang, 117043
                                         2800 LaSalle Plaza
                                         800 LaSalle Avenue
                                         Minneapolis, MN  55402-2015
                                         612-349-8500
                                         Fax: 612-339-4181
                                         Email:  cwmadel@rkmc.com
                                         Email:  kcwildfang@rkmc.com

                                         ATTORNEYS PLAINTIFF COMPUCREDIT
                                         HOLDINGS CORPORATION

---

[1]      CompuCredit does not seek to prohibit Defendants from selling their CompuCredit Notes, provided that said sales are undertaken individually and not pursuant to any joint action.